952 F.2d 405
 2 NDLR P 213
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Vincent D. KNOCK, Jr. Plaintiff-Appellant,
v.
Louis M. SULLIVAN, M.D., Secretary of the Department of
Health and Human Services, Defendant-Appellee.
 No. 91-1573.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 18, 1991.
Decided Jan. 10, 1992.
 
 Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Vincent Knock filed a complaint in the district court pursuant to 42 U.S.C. § 405(g) contesting the denial of his application for disability benefits. The district court granted the Secretary of Health and Human Services' Motion for Summary Affirmance, holding that the decision to deny disability was supported by substantial evidence.
 
 
 2
 Judge Mihm issued a well-reasoned and thorough memorandum opinion and order that considered all of the claims advanced by Knock and determined that the decision was supported by substantial evidence. After hearing oral argument, and reviewing the record and the briefs, we conclude that Judge Mihm correctly decided all the issues.
 
 
 3
 Because we are in agreement that the decision to deny disability was supported by substantial evidence, we affirm the judgment of the district court based on Judge Mihm's Memorandum Opinion and Order attached hereto as Appendix A.
 
 ATTACHMENT
 
 4
 UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF ILLINOIS
 
 
 5
 VINCENT D. KNOCK, JR., Plaintiff,
 
 
 6
 v.
 
 
 7
 LOUIS M. SULLIVAN, M.D., Secretary of the Department of
 
 
 8
 Health and Human Services of the United States of
 
 
 9
 America, Defendant.
 
 Case No. 89-1242
 ORDER
 
 10
 Before the Court are a Motion by Vincent D. Knock for summary reversal (# 7) and a Motion by the Secretary of the Department of Health and Human Services for summary affirmance (# 10) of a final decision of the Secretary which denied disability benefits to Knock. This Court denies Knock's Motion for Summary Reversal and grants the Secretary's Motion for Summary Affirmance.
 
 PROCEDURAL BACKGROUND
 
 11
 This is an action for judicial review of the final decision of the Secretary which denied Knock's application for disability insurance benefits under §§ 216(i) and 223 of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. Knock filed his application on February 25, 1987, alleging that he was disabled as a result of back trouble, high blood pressure, an ulcer, cirrhosis of the liver, and emphysema. (AR 72). This application was denied initially (AR 76-77), and on reconsideration. (AR 81-83). Knock requested a hearing and one was held on April 19, 1988 before an Administrative Law Judge ("ALJ"). (AR 39-71). Knock and his wife testified at the hearing and Knock represented himself. On June 23, 1988, the ALJ found that Knock was not disabled because he could perform a full range of sedentary work. (AR 236-237).
 
 
 12
 Knock requested review by the Appeals Council, and on October 20, 1988, the Appeals Council granted Knock's request, vacated the hearing decision, and remanded the case to the ALJ for further proceedings, including a new decision. (AR 243-245). The Appeals Council noted that the ALJ, after finding that Knock could not perform his past relevant work, failed to acknowledge that the burden then shifted to the Secretary to establish that the claimant could perform other work. (AR 244).
 
 
 13
 On December 9, 1988, the ALJ issued a new decision and found that Knock's capacity for the full range of sedentary work was reduced by specific non-exertional limitations. The ALJ used the medical-vocational guidelines as a framework for his decision-making and found that Knock was not disabled. (AR 25-27). Knock again requested review by the Appeals Council, and, on June 27, 1988, the Appeals Council granted Knock's request. The Appeals Council agreed with the ALJ's decision that Knock retained the residual functional capacity for sedentary work, reduced by his non-exertional limitations. (AR 246). The Appeals Council then found, however, that the ALJ had completed the psychiatric review technique form incorrectly, and, absent new and material evidence, it proposed to issue a revised psychiatric review technique form in which the missing elements would be filled out. (AR 247). The Appeals Council enclosed a copy of the proposed psychiatric review technique form in its letter to Knock. The Appeals Council also advised Knock that he could submit additional evidence or request an appearance before the Appeals Council to present oral argument within 20 days of receipt of this letter by Knock. (AR 247).
 
 
 14
 On August 28, 1989, the Appeals Council issued its decision. It noted that Knock had not responded to the Appeals Council's proposed decision or letter. (AR 5). The Appeals Council modified the ALJ's decision and appended a psychiatric review technique form which included the missing elements. (AR 7-15). The Appeals Council thus affirmed the ALJ's decision as modified by the appended psychiatric review technique form. (AR 6). The Appeals Council's decision then became the final decision of the Secretary in this matter. Knock then filed a complaint in the district court for review pursuant to 42 U.S.C. § 405(g).
 
 BACKGROUND FACTS
 
 15
 Knock was born on January 23, 1944, and he was 45 years of age at the time of the Appeals Council's decision. (AR 48). He completed high school, but he has not received any additional vocational training. (AR 49). He worked for Caterpillar Tractor Company as a quality control inspector for 22 years. (AR 49-50). Knock stopped working in September of 1986 when his back pain allegedly became unbearable. Knock testified that his major problem was that he could not perform any task for more than one or two hours. (AR 51). He testified that he was disabled as a result of his back pain, but he noted that his doctors had failed to find the cause of that pain. (AR 52). Knock then testified that the only way to relieve his back pain was to lie on a bed, a couch, or the floor. (AR 52).
 
 
 16
 Knock listed his medications as Zantac and Endocin for stomach problems and Flexoril, a muscle relaxant, and Tenormin, for high blood pressure. (AR 52-53). He stated that his ulcers were presently under control, that he had never been placed on a special diet as a result of his ulcers, and that medications had always aided this condition. (AR 55). He also testified that his blood pressure was under control and that it presented no problems. (AR 55).
 
 
 17
 Knock estimated that he could walk only one and one-half blocks and that he could stand in one spot for only 15 or 20 minutes. (AR 57-58). Knock testified that he did not take part in activities and that he did not belong to any social clubs. (AR 60). He stated that the only thing he did to pass the time was to lie on the couch and play his guitar. (AR 61). He testified that he did not drink, and he noted that he had not had a drink in one year. (AR 62). He denied that he had cirrhosis of the liver, stating that recent tests show that his liver was functioning normally. (AR 63).
 
 
 18
 Knock then concluded his testimony by telling the ALJ that he did do some things like going out to get cigarettes. (AR 64). He said that he could drive an automobile for two or three hours at a time, but that there were other times when he could not perform these activities. (AR 64).
 
 
 19
 Kathleen Knock then testified and stated that her husband had severe back problems. (AR 67). She stated that the doctors had never recommended surgery for her husband's back, and she expressed her frustration with the doctors for their propensity to perform numerous tests. (AR 68).
 
 
 20
 On September 15, 1986, Knock saw Dr. John L. Luetkemeyer who reported that Knock's medical history was suggestive of inflammatory arthropathy.[1] (AR 156). However, the doctor found that Knock's physical findings were not supportive of that etiology. (AR 156). The doctor also found multiple tender areas along the spinal column that were consistent with muscle spasms. (AR 156).
 
 
 21
 On September 15, 1986, Knock entered Eureka Hospital complaining of incapacitating back pain. (AR 158). Dr. S.K. Jones, the admitting physician, ordered an extensive series of x-rays that showed moderate osteophyte spurring in the lumbosacral spine. (AR 158). After a physical examination, Dr. Jones diagnosed chronic back pain with no evidence of systemic rheumatoid process. (AR 159). However, he did find sudden occurrences of marked elevation in blood pressure, gastritis, probable alcohol abuse, heavy cigarette smoking, and the absence of a kidney. (AR 159). He recommended evaluation and therapy for Knock. (AR 159).
 
 
 22
 On September 16, 1986, Dr. H.J. McMenamin found in a consulting examination that Knock had a spasm in the left lateral neck but that his range of motion in his neck was normal. (AR 160). He found a spasm in the lower left thoracic area as well. (AR 160). The doctor also stated that straight leg raising was normal and that all Knock's reflexes were normal. (AR 160). The doctor diagnosed that Knock had cervical radiculitis[2] and thoracic strain. (AR 160).
 
 
 23
 On September 17, 1986, an x-ray of the cervical spine produced an essentially negative study which showed no evidence of a fracture, bone destruction, or significant arthritic changes. (AR 167). An x-ray of the thoracic spine showed a slight scoliosis.[3] (AR 167).
 
 
 24
 When Knock left the hospital on September 19, 1986, Dr. Jones reported that the physical therapy that Knock received twice each day seemed to be very helpful. (AR 171). During the hospitalization, Knock did not develop any withdrawal symptoms or tremulousness despite his presumed alcoholism. (AR 171). A pulmonary function test produced an FEV-1 reading of 3.60 (AR 165), and, thus, the overall results from the pulmonary testing were consistent with mild obstructive disease. (AR 172).
 
 
 25
 On October 7, 1986, Knock told Dr. McMenamin that he was having more good days than bad. (AR 175). On examination, the doctor found rotation of the neck was normal and that there was no evidence of spasms. (AR 175). The doctor took Knock off treatment and told him to do his treatment one time each day at home. (AR 175). He was scheduled to return to work on October 18, 1986. (AR 175).
 
 
 26
 On October 28, 1986, Knock returned to Dr. McMenamin and reported that he had not returned to work. (AR 174). The doctor noted that Knock was partially intoxicated, and he noted that Knock acknowledged that he had drank one-half pint of whiskey that morning. (AR 174). On examination, straight leg raising was normal and Knock did a sit up unassisted. (AR 174). There was no apparent spasm of the neck or in the back and Knock's range of motion in the neck was normal. (AR 174). The doctor failed to find any objective evidence to indicate that Knock could not work. (AR 174).
 
 
 27
 On January 8, 1987, Knock saw Dr. Dennis J. Garwacki for a consultive examination. (AR 181). Knock told the doctor that physical therapy had helped to relieve his back pain, but that his pain had returned after he returned to work. (AR 181). Knock submitted to a series of tests, including a magnetic resonance imaging scan that produced normal results for the thoracic area.[4] (AR 182). Upon examination, the doctor found a full range of motion in Knock's cervical spine. (AR 182). Knock performed straight leg raising to 90 degrees bilaterally and had full flexion of the lumbosacral spine. (AR 182). The rest of the neurological examination was entirely within normal limits, and the doctor reported that he could find no objective evidence of any neurological disease. (AR 182). Dr. Garwacki concluded that Knock's complaints were muscular in origin with most of the serious complaints relating to the thoracic area. (AR 182).
 
 
 28
 On March 31, 1987, Knock's general practitioner, Dr. David L. Miller, reported that Knock's respiratory problems resulted from chronic obstructive pulmonary disease, secondary to smoking. (AR 206). The basic form of treatment the doctor recommended was for Knock to stop smoking. (AR 206). The doctor predicted that Knock would have shortness of breath upon marked physical activity, but he also noted that Knock had no problems with sitting, standing, or with normal day to day activities. (AR 106).
 
 
 29
 Dr. Miller reported that prior to the most recent flare up of Knock's back problems, Knock had seen Dr. Luetkemeyer for arthralgias (joint pains). (AR 206). Dr. Luetkemeyer, however, found no serious arthritic component to the arthralgias. (AR 206). The doctor also noted that since the hospitalization of Knock in September of 1986, Knock had had a CT scan of his back[5], an MRI scan, and a myelogram.[6] (AR 207). All of these procedures produced negative results. (AR 207). Dr. Miller noted that the three consultive physicians, Drs. Nord, McMenamin, and Garwacki, all felt that the back problems were secondary to chronic muscle spasms. (AR 207). Further, Dr. Miller noted that, as a result of recent improvement, he was guardedly optimistic that Knock would successfully return to work in the near future. (AR 207). In commenting on Knock's suspected problems with alcohol abuse, he stated that continued alcohol abuse would definitely impair Knock's ability to work. (AR 207).
 
 
 30
 In a follow-up letter dated June 8, 1987, Dr. Miller reported that he released Knock to return to work on March 27, 1987. (AR 215). However, the doctor noted that Knock was then evaluated by the plant physician who wanted Knock's possible alcohol abuse evaluated before he would allow Knock to return to work. (AR 215). On April 20, 1987, Dr. Miller stated in a letter that he had convinced Knock that he should take part in an alcohol treatment program. (AR 215).
 
 
 31
 Dr. Miller stated that, as of May 20, 1987, he believed that Knock had chronic radiculitis and muscular strain and that these conditions precluded him from returning to work. (AR 216). In the following paragraph, Dr. Miller stated that Knock would not be able to be employed at any type of physically demanding work. (AR 216).
 
 
 32
 Dr. Miller also discussed the problem of Knock's elevated liver enzymes in conjunction with his suspected alcoholism. (AR 216). He reported that Knock had consistently stated that he had not abused alcohol since September of 1986; however, he noted that denial is always a prominent part of alcoholism. (AR 216). Irregardless, he stated that he was not ready to diagnose Knock as an active alcoholic. (AR 216).
 
 
 33
 On May 28, 1987, Knock saw Dr. Richard Brady, a psychiatrist, for an evaluation. (AR 210). Knock told Dr. Brady that he had never been psychiatrically hospitalized nor had he ever been hospitalized for abuse of alcohol or drugs. (AR 210). Knock also stated that his employer had placed him in an alcohol treatment program, but he noted that he left after only 20 hours against medical advice. (AR 210). Dr. Brady found that Knock was not having any delusions or hallucinations; however, he did notice a rapid, forceful, fine tremor. (AR 211-212). No other involuntary movements were noted. (AR 211). The doctor characterized Knock's immediate memory as fair to good, his remote memory as fair, and his recent memory as poor to fair after formal testing. (AR 211). Dr. Brady estimated that Knock's intelligence was somewhat above average. (AR 211). Dr. Brady listed his impression of Knock's diagnoses as narcissistic personality disorder, possible atypical bipolar disorder, probable atypical or mixed organic brain syndrome which is mild, and a history of probable alcohol abuse. (AR 211-212).[7]
 
 DISCUSSION
 
 34
 In order to be entitled to disability benefits under SSI, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See, 20 C.F.R. §§ 494.1566, 416.966 (1986).
 
 
 35
 The establishment of disability under the Social Security Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made by using a five step test. See, 20 C.F.R. §§ 404.1520, 416.920.
 
 
 36
 The five step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?
 
 
 37
 An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir.1984).
 
 
 38
 The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Secretary to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir.1985); Havorsen v. Heckler, 743 F.2d 1221 (7th Cir.1984).
 
 
 39
 The rules in the grid, set out in Appendix 2 of Subpart P of 20 C.F.R. § 404, are considered in determining whether a plaintiff with exertional impairments is or is not disabled. The regulations provide that if an individual suffers from a non-exertional impairment, as well as an exertional impairment, both are considered in determining residual functional capacity. 20 C.F.R. §§ 404.1545, 416.945. If a finding of disability cannot be made based upon exertional limitations alone, the rules established in Appendix 2 are used as a framework in evaluating disability. In cases where the individual has solely a non-exertional impairment, such as pain or mental impairment, a determination as to whether disability exists is based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2.
 
 
 40
 The Court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence. The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgato v. Bowen, 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings are unsupported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985).
 
 
 41
 At steps 1 and 2 of the sequential evaluation process, the Secretary found that Knock had not engaged in substantial gainful activity since September 20, 1986. Also, he found that Knock had severe thoracic back pain, narcissistic personality disorder, somatoform disorder, chronic alcohol abuse, a history of probable drug abuse, probable atypical or mixed organic brain syndrome, possible atypical bipolar disorder, mild anxiety with fine tremors, chronic obstructive pulmonary disease, a history of smoking, a history of erythrocytosis, elevated liver enzymes, peptic ulcer disease, hypertension, and peyronie's disease. However, at step 3 of the process the Secretary found that Knock did not have an impairment or combination of impairments that met or equalled a listed impairment. At step 4, the Secretary found that Knock had the residual functional capacity to perform sedentary work reduced by non-exertional impairments that precluded Knock from working at heights or performing jobs that required a high degree of concentration, a high degree of interpersonal relations, or a large amount of stress. At step 5 the Secretary used the medical-vocational guidelines, specifically grid rule 201.28, as a framework to determine that Knock could perform work that existed in significant numbers in the national economy. (AR 26).
 
 
 42
 Knock attacks the Secretary's findings at steps 3 and 5 of the sequential evaluation process.
 
 
 43
 A. IS THE DECISION OF THE SECRETARY FINDING THAT KNOCK DOES NOT HAVE AN IMPAIRMENT EQUAL TO A LISTED IMPAIRMENT AT STEP 3 OF THE SEQUENTIAL EVALUATION PROCESS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD?
 
 
 44
 Knock asserts that the Secretary, hampered by an incomplete psychiatric report from Dr. Brady, failed to fully evaluate Knock's mental impairments. Knock argues that Dr. Brady's report was incomplete because it lacked a form entitled Medical Assessment of Ability to do Work-Related Activities--Mental. (See, Appendix attached to Knock's Motion for Summary Reversal). Thus, as a result of this missing form, Knock contends that a remand is warranted for additional psychiatric evaluation because the Secretary cannot make medical assessments of a claimant's condition but must draw these conclusions based upon medical evidence. See, Kent v. Schweiker, 710 F.2d 110, 115 (3rd Cir.1983). Further, Knock notes that, since the claimant was proceeding pro se, the ALJ has a duty to scrupulously and conscientiously probe into, inquire of, and explore all of the relevant facts. See, Cannon v. Harris, 651 F.2d 513, 519 (1981). Based upon 20 C.F.R. § 404.944, Knock contends that the ALJ has an obligation to fully develop the issues for a full and fair and complete decision on the claimant's conditions and their impact on his ability to work. Knock notes that the Eighth Circuit Court of Appeals has held that it is reversible error for an ALJ not to order a consultive examination when such an evaluation is necessary for him to make an informed decision. Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir.1985). And, Knock notes that the Seventh Circuit has stated:
 
 
 45
 Where there is evidence of alcohol abuse, the Secretary must inquire whether the claimant is addicted to alcohol and, as a consequence, has lost the ability to control its use. (Citation omitted).
 
 
 46
 Cannon, 651 F.2d at 519.
 
 
 47
 As the Secretary contends, this Court believes that Dr. Brady's report, as well as the opinion of the treating physician, Dr. Miller, and the statements which the claimant himself made to the doctors, allowed the ALJ to fully and properly evaluate Knock's mental condition, including his narcissistic personality and suspected alcoholism. With respect to the mental assessment of ability to do work-related activities--mental form, Knock has cited no authority which would require that the Secretary ask a consulting psychiatrist to complete the mental assessment form. As the Secretary notes, the Seventh Circuit has stated:
 
 
 48
 We are not convinced that he was obligated to order more examinations at the government's expense without a reason to expect that the results would differ. (Citation omitted).
 
 
 49
 See, Andrews v. Bowen, 848 F.2d 98, 101-102 (7th Cir.1988). In this case, based upon the entire record, the Secretary was not compelled to order an additional psychiatric evaluation as this Court does not believe that there is a reason to expect that the results would differ. In addition, this Court believes that this case is distinguishable from the Kent case because this Court believes that the ALJ based his conclusions on the medical and other evidence in the record and that he did not place himself in the role of the physician.
 
 
 50
 The Secretary properly evaluated Knock's mental impairments under the impairment listings, and he determined that they were not so functionally restrictive as to preclude his performance of substantial gainful activity. Under listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.06 (anxiety related disorders), 12.07 (somatoform disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders), the establishment of a presumptive disability requires: (1) documentation of a medically determinable mental impairment (i.e., the "A" criteria of the listing) which, if met, leads to (2) an assessment of its severity in terms of the functional limitations it imposes on a claimant's activities (i.e., the "B" criteria). In this case, the Secretary determined that Knock met the "A" criteria for all of the above-mentioned listings. However, based on the evidence in the entire record, the Secretary found that Knock failed to meet the "B" criteria for any of these listings.[8]
 
 
 51
 As the Secretary's decision indicated, Knock only had slight difficulties in activities of daily living and moderate difficulties in maintaining social functioning. (AR 14). Moreover, he seldom showed difficulties in concentration, persistence, or pace, and he never demonstrated episodes of deterioration or decompensation at work, or in work-like settings. (AR 14). Thus, Knock did not satisfy the requirements of the "B" criteria of the listings.
 
 
 52
 In addition, the Court does not believe that additional evaluations were necessary for an informed decision in this case. Although Dr. Brady commented that Knock's grooming and hygiene were less than perfect (AR 210-211), Knock himself testified that he had no difficulties taking care of his personal needs. (AR 64-65). Also, he told Dr. Brady that he showered on a daily basis. (AR 212). Although Knock alleged that he could not do the laundry, housecleaning, or grocery shopping, he attributed his difficulties in doing these activities to back pain. (AR 212). Further, Knock told Dr. Brady that he shopped, cooked at least two times a week, went to a restaurant once each week, and visited with friends. (AR 210-213). He then testified and he told Dr. Brady that he drove an automobile on a daily basis. (AR 64, 212). Knock's daily activities indicated that his mental impairments did not substantially restrict his daily living.
 
 
 53
 In addition, Dr. Brady thoroughly tested Knock's memory and his ability to concentrate. Based on those results, the Secretary concluded that deficiencies in concentration, persistence, or pace occurred infrequently. When Dr. Brady tested Knock's immediate memory, Knock remembered five out of five items on his first attempt. (AR 212). After 15 minutes he remembered two of the five items. (AR 212). Also, Knock named all the presidents back to Eisenhower and he correctly named the number of states in the United States. (AR 212). He calculated serial sevens correctly, making no mistakes in seven calculations. (AR 212). Moreover, Knock did not present any evidence of episodes of deterioration or decompensation at work or in work-like settings. In fact, he testified and he told Dr. Brady that the only reason he was not working was because of his back problem. (AR 51, 69, 210). Thus, the Secretary, based upon Dr. Brady's evaluation and the claimant's own statements, thoroughly evaluated Knock's mental impairments and found that none were disabling.
 
 
 54
 As stated earlier, Knock argues that the Secretary's findings are deficient in regard to his alcoholism, and he requests a remand to determine how the alcoholism affects his ability to perform work-related activities. As the Secretary contends, there was a sufficient amount of evidence in the record which showed that Knock's alcoholism did not present a disabling problem. When Knock was hospitalized in September of 1986, he never developed any withdrawal symptoms or tremulousness despite the presumed alcoholism. (AR 171). When Knock saw Dr. Brady, he denied that he had an alcoholism problem (AR 210), causing Dr. Brady to diagnose only a history of probable alcohol dependence. (AR 212). In June of 1987, based upon Dr. Brady's report and his own eight month treatment of Knock, Dr. Miller stated that he was not ready to diagnose Knock as an active alcoholic and that he felt that there had been an attempt to use the alcoholic problem to obscure the original reason for disability, the patient's back problems. (AR 216). At the hearing, Knock testified that he had not had a drink in the past year. (AR 62). Because neither the consulting psychiatrist or the treating physician diagnosed Knock as an alcoholic, because Knock's testimony showed that his work had never been affected by alcoholism, and because Knock was probably not currently drinking, the Secretary had a substantial basis for concluding that alcoholism would not prevent Knock from working.
 
 
 55
 Knock argues that the evidence in the record, specifically Knock's testimony regarding his allegedly restricted activities, shows that Knock was significantly limited by his alcoholism problem. However, Knock consistently testified that his inability to perform household chores resulted not from his drinking but as a result of his back impairment. (AR 62).
 
 
 56
 Knock also accuses the Secretary of ignoring the evidence of diminished activities in rendering a medical opinion that he was not qualified to make. However, the regulations specifically describe how the Secretary should evaluate each of the "B" criteria. See, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(1)-(4). The regulations also specifically provide that an ALJ need not consult a medical expert when completing a psychiatric review technique form. See, 20 C.F.R. § 404.1520(a)(d)(1)(i). Thus, since there was substantial evidence in the record to support the ALJ's decision with respect to the "B" criteria, his findings in the psychiatric review technique form are not a medical opinion.
 
 
 57
 Further, in view of Knock's own statements, his assertion regarding diminished activities is misplaced. As stated earlier, Knock repeatedly asserted that his inability to perform activities for more than one or two hours at a time resulted solely from his back impairment. (AR 51-52, 84, 210). With regard to his performance of chores around the house, Knock stated that he would never do chores unless the house was "falling in." (AR 63). If there was any conflicts in the evidence, the ALJ properly resolved those conflicts against Knock. See, Walker v. Bowen, 834 F.2d 635, 644 (7th Cir.1987).
 
 
 58
 B. IS THE SECRETARY'S FINDING THAT KNOCK COULD PERFORM SEDENTARY WORK SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD?
 
 
 59
 Knock next attacks the Secretary's finding at step 5 of the sequential evaluation process that Knock could perform other work that exists in significant numbers in the national economy on several grounds. Initially, Knock argues that the ALJ ignored the findings of his treating physician, Dr. Miller, who opined that Knock could no longer perform physically demanding work. (AR 215-217). However, the ALJ took this opinion into consideration when he found that Knock could no longer perform his past relevant work. In his job as an inspector, Knock lifted objects weighing more than 100 pounds occasionally, and objects weighing as much as 50 pounds frequently. (AR 97). Thus, accordingly, the ALJ reduced Knock's residual functional capacity from heavy to sedentary. (AR 26).
 
 
 60
 There was substantial evidence to support the Secretary's finding that Knock could perform sedentary work. On September 16, 1986, Knock demonstrated a normal range of motion in the neck, and performed straight leg raising tests to 90 degrees (normal) in both legs. (AR 160). On September 17, 1986, an x-ray of the cervical spine produced negative findings while an x-ray of the thoracic spine produced a single finding of slight scoliosis. (AR 167). On October 7, 1986, based on these findings and a physical examination, Dr. McMenamin opined that Knock could return to work in less than two weeks. (AR 175). When Knock did not return on the scheduled date, Dr. McMenamin conducted a second physical examination and found that straight leg raising was normal and that there was no apparent spasm in the back or neck. (AR 174). Based on these results, Dr. McMenamin concluded that there was no objective evidence to explain why Knock could not return to work. (AR 174).
 
 
 61
 On January 8, 1987, Dr. Garwacki reported that a lumbar myelogram, a bone scan, regular x-rays and a magnetic resonance imagine scan had all produced normal results. (AR 181). On physical examination, the doctor found a full range of motion in the cervical spine and normal results on straight leg raising tests. (AR 182). Dr. Garwacki could find no objective explanation for Knock's complaints. (AR 182).
 
 
 62
 In addition, Dr. Miller's evaluation lends some support to the Secretary's decision. Dr. Miller commented that, although Knock would have some difficulty with shortness of breath upon marked physical activity, he had no problems with sitting, standing, or normal day-to-day moving about. (AR 206). Thus, the reports of Drs. McMenamin, Garwacki and Miller provide substantial evidence to support the conclusion of the Secretary that Knock possessed the exertional capacity for sedentary work.
 
 
 63
 Next, Knock contends that the ALJ found that he had "severe fine tremors" of the hands and that this finding alone would preclude him from performing sedentary work. As the Secretary notes, the ALJ merely found that Knock had "fine tremors," but he did not find that he had "severe fine tremors." (AR 26). In the psychiatric report of Dr. Brady, he noted some mild involuntary movements including a rapid forceful fine tremor. (AR 211). However, neither Dr. Brady nor the ALJ indicated the source of the tremors and neither indicated that the tremors limited Knock's ability to use his hands in any way. Further, Knock did not allege that he had any difficulty with his hands on his application for benefits, and he did not allege any difficulty in that area during his testimony. In addition, none of the doctors who examined Knock subsequent to his hospitalization in September of 1986 mentioned that he had any difficulty with his hands. In this case, the lack of evidence regarding any severe impairment regarding Knock's fine tremors made further articulation of this alleged impairment unnecessary.
 
 
 64
 Knock's final argument is that the ALJ and the Secretary improperly relied on the medical-vocational guidelines, the grid, in determining that Knock could perform other work that existed in the national economy. Knock contends that the case of Warmoth v. Bowen, 798 F.2d 1109 (7th Cir.1986) requires vocational testimony to assess the effect of Knock's non-exertional impairments on his projected job base.
 
 
 65
 In Warmoth, the Seventh Circuit outlined a test to determine when an ALJ must obtain vocational testimony in cases where the claimant cannot return to his past relevant work and where the claimant suffers from a non-exertional impairment. Warmoth, 798 F.2d at 1110. The Seventh Circuit went on to note that there will be some cases where it is obvious that a non-exertional limitation will have very little affect on the range of work that an individual can perform. Id. at 1112. In such cases, the Seventh Circuit stated that the grid may be all that is necessary to apply. In other cases, the Seventh Circuit recognized that a non-exertional limitation might substantially reduce a range of work an individual can perform. Id. In those cases, the Secretary or ALJ must consult a vocational expert. Id. In cases between the two extremes, the Seventh Circuit noted that these cases are more complex and will generally require additional evidence regarding the effects of the non-exertional limitation on the job base. Id. The test given by the Seventh Circuit stated:
 
 
 66
 While a vocational expert's specialized knowledge undoubtedly would be helpful in the present case, this is not to say that testimony from such an expert is required in this and every other case involving a non-exertional impairment, see 20 C.F.R. § 404.1566(e) (1985) (Secretary may use his discretion in employing the services of a vocational expert); rather, we only require that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available. (Citations omitted).
 
 
 67
 Id.
 
 
 68
 The Secretary contends that the non-exertional impairments were fully evaluated by reference to the introductory comments to 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.28 of Table 1. In referring to the comments in Appendix 2, the ALJ stated in summary fashion:
 
 
 69
 As the claimant's capacity for the full range of sedentary work has not been significantly compromised by his additional non-exertional limitations, using the above-cited rules for a framework for decision making, the claimant is not disabled.
 
 
 70
 (AR 25). The ALJ concluded that, based on the claimant's exertional capacity for sedentary work and the claimant's age, education, and work experience, Rule 201.28 directs that Knock must be found not to be disabled. (AR 26).
 
 
 71
 This Court agrees with the ALJ. As the Secretary contends, the grid is designed so that it reflects jobs that require a normal degree of concentration or no more than a normal amount of interaction with the public. Knock's mental impairments only limited him from performing those jobs which would require more than a normal amount of concentration or more than a normal amount of interaction with the public. (AR 24). Further, given the nature of the comments of Dr. Miller, this Court would conclude that Knock's problems with pulmonary disease were actually an exertional and not a non-exertional impairment. His own treating physician Dr. Miller noted that the problems related to this disease were caused by Knock's smoking and that Knock's work-related problems would result from his shortness of breath upon marked physical activity. (AR 206). Dr. Miller stated that the basic form of treatment for his problem had been to attempt to get Knock to stop smoking. (AR 206). Thus, the sedentary jobs contemplated in the grid would not require Knock to perform job duties precluded by the Secretary's acknowledgement of his non-exertional limitations. (AR 24). As the Secretary contends, because it was obvious that the non-exertional limitations in this case would have very little affect on the range of work which Knock could perform, the application of the grid was all that was necessary in this case.
 
 CONCLUSION
 
 72
 This Court DENIES Knock's Motion for Summary Reversal (# 7) and GRANTS the Secretary's Motion for Summary Affirmance (# 10). The Clerk is directed to enter judgment in favor of the Secretary and against Knock.
 
 
 73
 ENTERED this 14th day of January, 1991.
 
 
 74
 /s/Michael M. Mihm
 
 
 75
 /s/United States District Judge
 
 
 
 [1]
 Arthropathy is arthritis with joint swelling and bony enlargement, most commonly in the small joints of the hand, but also affecting other joints. The disease is characterized on x-rays by narrowing of the joint space. Inflammatory arthropathy refers to a disease of a joint of inflammatory origin. W.B. Saunders Company, Dorland's Illustrated Medical Dictionary, (hereinafter "Dorland's"), 123 (26th Ed.1985)
 
 
 [2]
 Radiculitis is the inflammation of the root of a spinal nerve, especially that portion of the root that lies between the spinal cord and the inner vertebral canal. Dorland's at 1108
 
 
 [3]
 Scoliosis is an appreciable lateral deviation in the normally straight vertical line of the spine. Dorland's at 1181
 
 
 [4]
 A magnetic resonance imaging scan (MRI) is a specialized x-ray technique that produces a study of an area of the body by recording and displaying an image of the concentration of an injected radioactive substance that has an affinity for that tissue. Intermed Communications, Inc., Definitions, 884 (1981)
 
 
 [5]
 A CT scan is an abbreviation for computerized tomography and is an x-ray technique that is used to attain a series of detailed visualizations of tissues at any depth desired. Tumor masses, infarctions, bone displacement, and accumulations of fluid may be detected. Definitions, at 236
 
 
 [6]
 A myelogram is an x-ray taken following the injection of radiopaque medium into the subarachnoid space to demonstrate any distortions in the spinal cord. Definitions at 639
 
 
 [7]
 Narcissistic personality disorder has as its essential feature a grandiose sense of self-importance or uniqueness; preoccupation with fantasies of unlimited success, etc. By definition some impairment in interpersonal relations always exists. Occupational functioning may be impaired, or may be interfered with by depressed mood, interpersonal difficulties, or pursuit of unrealistic goals. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (DSM III), 315-316 (3d Ed.1986)
 
 
 [8]
 To be presumptively disabled under listing 12.02 one of the following must be present, under 12.04 two of the following must be present, while three of the following must be present under listings 12.06, 12.07, and 12.08: (1) a marked restriction of activities of daily living; (2) a marked difficulty in maintaining social functioning; (3) frequent deficiencies in concentration, persistence, or pace; and (4) repeated episodes of deteriorated performance in work or work-like settings. 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.02, 12.04, 12.06, 12.07, and 12.08